**NELSON MULLINS RILEY &
SCARBOROUGH, LLP**
P. John Veysey (SBN: 296923)
john.veysey@nelsonmullins.com
One Financial Center, Suite 3500
Boston, MA 02111
Tel: (617) 217-4645 Fax: (617) 217-4710

**NELSON MULLINS RILEY &
SCARBOROUGH, LLP**
Michael J. Hurvitz (SBN: 249050)
mike.hurvitz@nelsonmullins.com
750 B Street, Suite 2200
San Diego, CA 92101
Tel: (619) 489.6110 Fax: (619) 821.2834

Attorneys for Applicant Banco Azteca S.A.
Institución de Banca Múltiple

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* Application of BANCO AZTECA S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No. 5:24-CV-2204<br><br>[*Assigned to General Duty Judge*]<br><br>**BANCO AZTECA'S NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING** |

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Applicant Banco Azteca, S.A. Institución de Banca Múltiple (the "**Applicant**" or "**Banco Azteca**") hereby moves this Court for an Order in support of its Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding (the "**Application**") from X Corp. (formerly known as Twitter, Inc.) ("**X**"), Meta Platforms, Inc. (formerly known as Facebook, Inc.) ("**Meta**"), and Google LLC ("**Google**") (collectively the "**California Entities**") for use by the Applicant in a foreign criminal proceeding in Mexico. Given the relief sought, Banco

1

Azteca may be available for a hearing, unless the Court prefers to rule on the Application without a hearing.

This Application is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declarations of Emilio Salazar Ilarregui Galetto as outside counsel of Banco Azteca, Jose Manuel Azpiroz Bravo as Chief Communications Officer of Grupo Elektra S.A.B. de C.V., and Mario Alvaro Figueroa Lopez as Applicant's Legal Counsel, and any other matters as may be presented to the Court at or prior to the hearing.

Dated: April 12, 2024

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:    */s/ Michael J. Hurvitz*
Michael J. Hurvitz
P. John Veysey
Attorneys for Applicant
BANCO AZTECA S.A. INSTITUCIÓN
DE BANCA MÚLTIPLE

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Banco Azteca is a bank that operates in Mexico. **Exhibit A,** Declaration of Emilio Salazar Ilarregui Galetto as outside counsel of Banco Azteca, at ¶1; **Exhibit B**, Declaration of Jose Manuel Azpiroz Bravo as Chief Communications Officer of Grupo Elektra S.A.B. de C.V.[1], at ¶2. Beginning in late 2023, Banco Azteca became the target of a coordinated multi-national financial terrorism campaign effectuated by mostly anonymous posters (the "**Anonymous Individuals**") on X, Facebook, and YouTube[2], each owned by the California Entities, respectively. Ex. B, ¶¶5-6; **Exhibit C**, Declaration of Mario Alvaro Figueroa Lopez as Applicant's Legal Counsel, at ¶¶4-5. In what appears to be a coordinated effort performed with the express purpose of financially harming Applicant and its leadership, the Anonymous Individuals falsely and repeatedly claimed the Applicant faced imminent bankruptcy urging customers to pull out deposits or risk losing their money. Ex. B, ¶¶5-13, 15-22; Ex. C, ¶¶4-5. Banco Azteca is not bankrupt and was not experiencing any bankruptcy crisis at the time of these posts. Ex. A, ¶¶7, 10-14. Additionally, the president of the National Banking and Securities Commission and the Governor of the Central Bank of Mexico since confirmed and affirmed Applicant's solvency and financial health. Ex. A, ¶¶10-14. Mexican authorities subsequently ordered Meta and X, among other platforms, to delete the posts at issue as false. Ex. C, ¶¶17-27.

Despite the Applicant's robust financial condition, this false and premeditated smear campaign negatively impacted the Applicant's business and market standing. Ex. A, ¶¶4-9. As was likely the intent of the campaign, the defamatory posts resulted in Banco Azteca losing approximately 7% of its deposits over several months, which amounted to a loss of about 800,000 accounts totaling about one billion U.S. dollars.

---

[1] Grupo Elektra S.A.B. de C.V. ("Grupo Elektra) is the Applicant's parent company. Ex. B, ¶9.

[2] YouTube is owned and operated by Google.

*Id.* at ¶¶5-6. Because Applicant is a major bank in Mexico, the Anonymous Individuals' actions caused panic in the financial system. *Id.* at ¶9. Indeed, certain of the Anonymous Individuals proudly boasted about that very effect of their defamatory statements. Ex. B, ¶15. To date, and in pursuit of criminal and civil actions in Mexico to remedy this harm, the Applicant has been unsuccessful learning certain posters' exact identities. Ex. B, ¶¶24-25, 29-33; Ex. C, ¶¶15-29, 41-43.

## II.    RELEVANT FACTS

The Applicant is a bank that operates in Mexico Ex. A, ¶1; Ex. B, ¶1. By November 2023, the Applicant was the ninth largest banking institution in Mexico in terms of assets, and as of January 2024, the second largest bank measured by number of clients. Ex. A, ¶4.

On or about late November 2023, mostly anonymous individuals using various accounts on different social media platforms began a smear campaign against the Applicant, stating that the Applicant was going bankrupt, that it would cease to exist in Mexico, and urged the public to withdraw their money from the Applicant's financial institutions. Ex. B, ¶¶5-6; Ex. C, ¶¶4-5. For example, one of the earliest and most extensive posters among the Anonymous Individuals used the X handle @catrina_nortena ("La Catrina Norteña"). Ex. B, ¶7. On November 26, 2023, in the first of multiple posts that Mexican officials later verified as entirely false, La Catrina Norteña stated the following:

> …Let's see how clients (now ex) of @Azteca Bank as @ELange47 just took out all his money, more than 88 thousand pesos, from that bank after the Suspicious Video of @ChapoyPati where it says that everything is "fine" with the bank. And after the Old Man #DonkeyTeeth @RicardoBSalinas could not pay the 488 million dollars he owes in New York plus the 25 thousand million pesos he owes in taxes, everything indicates that he lacks liquidity and that all his companies are about to fail...

/ / /

/ / /

/ / /

4

*Id.* at ¶8, Ex. 1 thereto at 1.[3] For reference Ricardo B. Salinas, or Ricardo Salinas Pliego, is a businessman in Mexico who is the Chairperson of Grupo Elektra, the Applicant's parent company. *Id.* at ¶9.

Each post included the hashtag "#bancoaztecaenquiebra" ("Banco Azteca bankrupt") which went viral, evident from the thousands of reposts of each post by this account. *Id.* at ¶¶10-13. The account posted at least ten other similar messages, each garnering more reposts and shares, and it began advising account holders to withdraw their money, falsely implying the Applicant's inability to guarantee funds. *Id.* at ¶12, Ex. 1 thereto at 2-18. For example, on December 7, 2023, in a post that received nearly 90,000 views, the account stated the following above a video of a woman claiming she needed to withdraw her accounts:

> @Azteca Bank is keeping the REMITTANCES of its clients who come from the US[.] Housewife tells how they illegally blocked her account and won't let her withdraw the money her husband sends from the US. She shows all the things they are asking from her to unblock it and advise others to withdraw their money before the same thing happens to them…

*Id.* at ¶13, Ex. 1 thereto at 16-17. Banco Azteca investigated the allegations made in the subject video, which were found to be baseless. *Id.* at ¶14.

Due to these and other social media posts, many of the Applicant's account holders rushed to withdraw their funds, which damaged the Applicant by causing a major loss of customers and their corresponding deposits. Ex. A, ¶¶5-8. The defamatory posts resulted in Banco Azteca losing approximately 7% of its deposits over several months. *Id.* at ¶6. This amounted to a loss of about 800,000 accounts, which totaled about one billion U.S. dollars. *Id*. Because Applicant is a major bank in

/ / /

---

[3] For the Court's reference, any social media posts that applicant quotes here are condensed, roughly translated from Spanish to English, and edited to remove graphics, including embedded videos, pictures, or text illustrations like "emojis." In addition to the exhibits, attached and cited herein, the posts at issue remain available on platforms like X. *See*, *e.g.*, https://twitter.com/catrina_nortena/status/1729183738624463153 (last visited February 26, 2024).

Mexico, the Anonymous Individuals' actions caused panic in the financial system. *Id.* at ¶9.

Removing any doubt of the Anonymous Individuals' intent to harm Applicant and its affiliated companies, out of political animus or otherwise, on December 5, 2023, La Catrina Norteña posted an image of Grupo Elektra's stock plunging during morning trading with the caption: "…The shares of @ElektraMx once again drop after rumors of BANKRUPTCY of its financial arm @Azteca Bank…" Ex. B, ¶15, Ex. 1 thereto at 12. As of February 25, 2024, the La Catrina Norteña account had over 205,000 followers. Finally, the same user appears to be using or feeding content through the YouTube Chanel "El Chapucero @NachoRgz," otherwise listed on Applicant's subpoena and listed herein as one of the Anonymous Individuals. *Id.* at ¶16.

Using numerous other accounts on the California Entities' platforms, the Anonymous Individuals quickly worked in coordination to elevate the campaign to damage Applicant's business, including the false and harmful narrative that a bank run had begun on Banco Azteca. *Id.* at ¶17. These included posts on the X accounts @Albert_Rudo[4], @RedAMLOmx; @AntiTelevisaMx[5]; and @varamburucano. *Id.* at ¶18. Additionally, the following users also spread content over X on the following accounts: @sandyatzuilera; @FreddyOliviery; @jgnaredo; @alvaro_delgado; @lisuonmonero; and @PonchoGutz. *Id.* at ¶19. Other users spread the same campaign over Meta's Facebook platform, including on the accounts Nación AMLO; El Chapucero; Defensa del Consumidor Mx; Morena New York Comité 1;

---

[4] *See*, *e.g.*, https://twitter.com/Albert_Rudo/status/1729281609260552305 ("Here we are going to see what a forcible seizure of the Azteca Bank…").

[5] *See*, *e.g.*, https://twitter.com/AntiTelevisaMx/status/1749425501977158131 ("The crime of FINANCIAL TERRORISM with which the criminal @RicardoBSalinas intends to sue those who talk about the bankruptcy of Banco Azteca, IT DOES NOT EXIST in the penal code. The crime that does exist is tax evasion and Salinas Pliego evades 25 thousand million pesos. JAIL TO SALINAS NOW!").

Tepalcatlalpan Vecinos; and Hans Salazar. *Id.* at ¶20. The following users also spread content as to the Applicant over Meta's Facebook platform on the following accounts: La Verdad Noticias and Luis Guillermo Hernandez. *Id.* at ¶21. The following users posted similar content on Google's YouTube platform: El Chapucero; Sin Censura TV[6]; Iber Alejandro[7]; El Charro Político[8]; and El Mexa Shorts. *Id.* at ¶22. These YouTube accounts have 1.6 million, 1.31 million, 1.15 million, 1.56 million, and 110,000 subscribers, respectively. *Id.* at ¶23.

Of all the accounts listed above, Applicant was only able to discover certain names of individuals who may be involved with some the accounts. *Id.* at ¶24. Applicant, however, remains unable to confirm that the names used in connection with those accounts actually belong to the posters. *Id.* at ¶25.

In addition to the financial and reputational harm incurred by these posts, Applicant and its affiliates had to undertake the onerous and expensive task of responding to other regulatory scrutiny and defending their reputation following months of negative exposure in the Mexican news media.[9] Ex. B, ¶26. Among these efforts, the posts at issue forced the Applicant to seek public confirmation of the Applicant's financial health, solvency, and other compliance from the Mexican government's National Banking and Securities Commission ("CNBV"). Ex. A, ¶10. The CNBV oversees and regulates Mexico's financial institutions. *Id.* at ¶11. Banco Azteca's Capitalization Index (ICAP) on October 2023 was 15.08, so it is classified

---

[6] *See, e.g.,* https://www.youtube.com/watch?v=he60OghtHFw (translated video title: "WITHDRAW YOUR SAVINGS FROM BANCO AZTECA! THE CAMPAIGN THAT IS SOUNDING LOUD ON THE NETWORKS").

[7] *See, e.g.,* https://www.youtube.com/watch?v=pfFRkQIqVgA (translated video title: "BANCO AZTECA BANKRUPTCY WITHDRAW IMMEDIATELY").

[8] *See, e.g.,* https://www.youtube.com/watch?v=gXJ6rzC7Iko (translated video title: "REBELLION IN BANCO AZTECA! USERS TAKE THEIR MONEY").

[9] *See, e.g.,* El Universal, "Rumors about the effects on Banco Azteca's financial situation are false: Elektra" [translated] (December 4, 2023), https://www.eluniversal.com.mx/cartera/rumores-sobre-afectaciones-a-situacion-financiera-de-banco-azteca-son-falsos-elektra/.

in early warning category 1, indicating that the institution is sufficiently capitalized to face unexpected loss scenarios, so that no supervisory actions by the regulator are required in relation to its solvency. *Id.* at ¶12. Further, Jesus de la Fuente Rodriguez, the president of the National Banking and Securities Commission, affirmed Applicant's solvency and financial health. *Id.* at ¶13. Similarly, during the presentation of the Financial Stability Report of the second half of 2023, Victoria Rodriguez Ceja, Governor of the Central Bank of Mexico, confirmed and affirmed Applicant's solvency and financial health. *Id.* at ¶14. The CNBV's reports demonstrate why there is little doubt as to the knowing and reckless falsity of the posts at issue, highlighted by those posts' overt intent to harm the Applicant and its affiliates and leadership.

On January 17, 2024, the Applicant's legal representatives in Mexico demanded in writing that Meta and X, through their affiliates, remove certain offending posts and disable their related accounts. Ex. B, ¶27, Ex. 2 thereto; Ex. C, ¶6, Ex. 1 thereto. These letters explained why those accounts violated Mexican law and the X and Meta's own respective policies. Ex. C, ¶7, Ex. 1 thereto. These laws included Section III of Article 254 of the Federal Criminal Code, which criminalizes false statements or news that may create economic disturbances in Mexico's domestic market. *Id.* at ¶8, Ex. 1 thereto.

On January 19, 2024, Applicant filed a criminal complaint, which was registered under investigation folder number 5101/202254 of Agency 4 of Bulk Processing of the Public Prosecutor's Office of the State of Jalisco. *Id.* at ¶9. The criminal complaint included counts for blackmail based on statements made to the Applicant by individuals purportedly representing the alleged posters that they would take down the posts if the Applicant paid them. *Id.* at ¶10.

On January 19, 2024, Applicant ratified the criminal complaint and was recognized as the offended party. *Id.* at ¶13. The Investigating Police Officer in charge of the coordination of the Cybernetic Police assigned to the General Director of

Intelligence of the State of Jalisco, in accordance with a resolution granted, proceeded to issue demands to the social networks Facebook, TikTok,[10] and X to provide user identification data for the alleged accounts. *Id.* at ¶15. To date, neither the Applicant nor the Public Prosecutor's Office of the State of Jalisco have received notices of the request. *Id.* at ¶16.

On February 6, 2024, a Hearing for the Reinstatement of the Status Quo to its Previous State was held and the Preliminary Criminal Judge ordered that Meta and X remove the offending publications from at least ten accounts, including those relating to the La Catrina Norteña, Defensa del Consumidor, Alberto Rudo, Hanz Salazar, Red AMLO Mx, and El Chapucero accounts. *Id.* at ¶17.

On February 9, 2024, the Applicant, as Complainant, requested the Preliminary Criminal Judge to directly send the respective official notices to the Mexico City addresses for each social network, so that they comply with the order issued in the hearing held on February 6, 2024. *Id.* at ¶18. On February 13, 2024, the Preliminary Criminal Judge granted Applicant's request. *Id.* at ¶19. The official notice was physically delivered by the Applicant to Meta on February 23, 2024. *Id.* at ¶20. However, Facebook México, S. de R.L. de C.V., returned the notice and stated that Meta Platforms, Inc and/or Meta Technologies Ireland Limited are not domiciled in the place where the notice was delivered. *Id.* at ¶21. It mentioned that the entity that operates the Facebook service for users in Mexico is Meta Platforms, Inc, and thus, it is the entity that has control over the information of the users. *Id.* at ¶22. It further stated that it was unable to address the request because the U.S. based entity managed the data system that stored this information, and therefore, the notice had to be delivered to such entity in its domicile at 1601 Willow Rd., Menlo Park, CA 94025, USA. *Id.* at ¶23. The official notice that was directed at X could not be delivered because X does not have a known domicile in Mexico. *Id.* at ¶24.

---

[10] TikTok is a separate platform that is located in a different jurisdiction. Accordingly, Applicant does not otherwise address that entity in this Application.

On February 16, 2024, the Applicant requested the Preliminary Criminal Judge to send the official notices to the social networks with the aid of the judicial authorities of Mexico City by means of an interstate communication. *Id.* at ¶25. The request was granted, and the interstate communications were sent. *Id.* at ¶26. Applicant is waiting for the Mexico City authorities to inform the Preliminary Criminal Judge whether they have received the communication and delivered the notices to the social networks, as requested. *Id.* at ¶27. Accordingly, Applicant has exhausted its ability to attempt to obtain the requested information from the California Entities, or their Mexican affiliates. *Id.* at ¶28.

## III.  LEGAL STANDARD

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order [them] to give [their] testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person . . . ." 28 U.S.C. § 1782(a). To obtain discovery under Section 1782, an applicant must meet three statutory requirements: (1) the person or entity from whom discovery is sought "resides or is found" in this district; (2) the discovery must be for the purpose of "use in a proceeding" before a "foreign or international tribunal;" and (3) the application must be made by an "interested person" in the foreign judicial proceeding." *In re Bureau Veritas*, 5:22-MC-80132-EJD, 2022 WL 3563773, at *2 (N.D. Cal. Aug. 17, 2022) (citing *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019)).

Once the District Court has determined that the mandatory requirements for relief under Section 1782 are met, the Court is free to grant discovery in its discretion. The United States Supreme Court identified the following discretionary factors courts should consider in evaluating a Section 1782 application: (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S.

federal-court judicial assistance;" (3) whether the discovery request is an "attempt to circumvent proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the discovery requested is "unduly intrusive or burdensome." *In re Takagi*, 23-MC-80124-JSC, 2023 WL 4551074, at *3 (N.D. Cal. July 13, 2023) (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) ("*Intel*").

Furthermore, because the standards set forth in the Federal Rules of Civil Procedure guide discovery under Section 1782, in addition to the standards the Supreme Court set forth in *Intel*, some courts may apply an additional "good cause" standard like courts may apply under Rule 26(d) for early discovery requests. *In re Hoteles City Express*, No. 18-MC-80112-JSC, 2018 WL 3417551, at *3 (N.D. Cal. July 13, 2018) (citing *OpenMind Solutions, Inc. v. Does 1–39*, No. 11–3311, 2011 WL 4715200, at *2 (N.D. Cal. Oct. 7, 2011)). To consider whether there is "good cause" to support a Section 1782 application to reveal an unknown party's identity, courts examine these factors:

> (1) the plaintiff can identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court; (2) the plaintiff has identified all previous steps taken to locate the elusive defendant; (3) the plaintiff's suit against defendant could withstand a motion to dismiss; and (4) the plaintiff has demonstrated that there is a reasonable likelihood of being able to identify the defendant through discovery such that service of process would be possible.

*In re Hoteles City Express*, 2018 WL 3417551, at *3; *see also Tokyo Univ. of Soc. Welfare v. Twitter, Inc.*, 21-MC-80102-DMR, 2021 WL 4124216, at *3 (N.D. Cal. Sept. 9, 2021).

## IV.  ARGUMENT

United States District Courts are empowered by 28 U.S.C. § 1782 to compel discovery for use in a proceeding in a foreign or international tribunal. In this case, the Applicant requests information from X, Meta, and Google, all of which are located within the jurisdiction of this Court, regarding the identity of the anonymous

individuals, for use in a current criminal proceeding in Mexico. For the reasons set forth below, this Court should grant this Application, and authorize the issuance of the Subpoenas attached as **Composite Exhibit D.**

### A. The Discovery Sought Meets the Statutory Requirements of Section 1782

#### 1. The Entities from Which Discovery Is Sought Reside or are Found in this District.

The California Entities from which the Applicant seeks discovery, specifically X, Meta, and Google, are all found in this District. **Composite Exhibit E**: California Statements of Information for X, Meta and Google. X is a Nevada corporation with its principal office located in San Francisco, California. *Id.* at 1. Meta is a Delaware corporation with its principal office located in Menlo Park, California. *Id.* at 3. Finally, Google is a Delaware limited liability company with its principal office located in Mountain View, California.[11] *Id.* at 5. All three are found within this District. See *In re Todo*, 5:22-MC-80248-EJD, 2022 WL 4775893, at *2 ("In this district, business entities are 'found' where the business is incorporated, is headquartered, or where it has a principal place of business."). Accordingly, the first statutory requirement is satisfied.

#### 2. The Discovery Is Intended for Use in a Foreign Proceeding.

The second statutory requirement is that the discovery sought is intended "for use" in a "foreign or international tribunal." See, e.g., *Intel Corp.*, 542 U.S. at 258. To meet the "for use" test, the materials sought need not be discoverable, *id.* at 243, nor must the applicant even show that the materials are admissible as evidence in the foreign jurisdiction. *Qualcomm Inc.*, 18-MC-80134-NC, 2018 WL 6660068, at *2 (N.D. Cal. Dec. 19, 2018); *In re Roz Trading Ltd.*, No. 1:06-CV-02305-WSD, 2007

---

[11] See *In re Todo*, 5:22-MC-80248-EJD, 2022 WL 4775893, at *2 (N.D. Cal. Sept. 30, 2022) (holding Google "resides or is found" within the Northern District of California because it is headquartered in and has its principal place of business in Mountain View, California).

WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("§ 1782 aid [is] appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a)…"); *In re Appl. Of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005). "Courts in the Ninth Circuit have observed that the 'for use' requirement focuses on the practical ability of an applicant to place a beneficial document … before a foreign tribunal." *Qualcomm Inc.*, 18-MC-80134-NC, 2018 WL 6660068, at *2 (internal quotations and citations omitted). "Thus, applicants must show that the material requested is tethered to a specific foreign proceeding and is relevant." *Id*. Finally, this requirement is not limited to adjudicative proceedings that are pending. Rather, Section 1782(a) may be invoked where such proceedings are "likely to occur" or are "within reasonable contemplation." *Intel Corp.*, 542 U.S. at 258–59.

The discovery Applicant seeks is relevant in the Mexican criminal proceeding. *See generally*, Exs. B, C. The discovery sought relates to uncovering the identity of the Anonymous Individuals, which is required for the pursuit of the criminal proceeding in Mexico. Ex. C, ¶29. Of note, unlike the United States, Mexico is a civil law country that allows its citizens to commence criminal proceedings. *Id*. at 12. Thus, the discovery sought would be beneficial and relevant to the proceedings in Mexico.

      3.    <u>The Applicant Is an Interested Person in the Foreign Judicial Proceeding.</u>

The Applicant is an "interested person" under Section 1782 because Applicant filed a criminal complaint against the anonymous individuals in Mexico and is the victim in that proceeding. (*See* Ex. C, ¶¶9-10, 13); *Intel Corp.*, 542 U.S. at 256 (holding that a complainant who triggered a European Commission investigation is an "interested person" under Section 1782); see also *In re Med. Inc. A'ss'n Keizankai*, 22-MC-80253-BLF, 2022 WL 5122958, at *3 (N.D. Cal. Oct. 4, 2022) (stating that a complainant in a criminal proceeding is an interested person and granting Japanese applicant's application to seek foreign discovery from Google to learn identity users

that left reviews for which the Applicant claimed business harm and sought civil and criminal relief.). Accordingly, the Applicant satisfies this statutory requirement.

**B.    The Discovery Sought Meets the *Intel* Discretionary Factors**

The Court should also grant this Application for Discovery based on the discretionary factors identified by the Supreme Court in *Intel*.

1.    The California Entities Are Not Participants in the Foreign Proceeding.

The first *Intel* factor is "whether the person from whom discovery is sought is a participant in the foreign proceeding." *Intel Corp.*, 542 U.S. at 264. X, Meta, and Google are not parties or participants in the criminal proceeding in Mexico and it is not expected that they will become parties. Ex. C, ¶14. Accordingly, this factor weighs in favor of granting the Application. *See Intel Corp.*, 542 U.S. at 264 ("the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

2.    No Challenges Exist Regarding the Nature of the Foreign Tribunal and the Mexican Government's Probable Receptivity to the Court's Judicial Assistance.

The second *Intel* factor requires the Court to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel Corp.*, 542 U.S. at 264. "This factor focuses on whether the foreign tribunal is willing to consider the information sought." *In re Ex Parte App. Varian Med. Sys. Int'l AG*, No. 16-mc-80048-MEJ, 2016 WL 1161568, *4 (N.D. Cal. Mar. 4, 2016). Under this factor, "courts look for authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *In re Application of Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203-MEJ, 2016 WL 6474224, at *5 (N.D. Cal. Nov. 2, 2016) (emphasis in original). In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of Section 1782, courts

tend to err on the side of permitting discovery. *In re Ex Parte Application Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *4.

There are no known restrictions or any policies under the laws of Mexico limiting U.S. federal court judicial assistance, and courts and police in Mexico are receptive to assistance in discovery by U.S. federal courts. Ex. C, ¶¶30-32. Furthermore, courts in other jurisdictions have granted Section 1782 discovery for use in proceedings in Mexico. See e.g. *In re Application of Banco Mercantil De Norte, S.A.*, 3:23MC08 (DJN), 2023 WL 6690708, at *7–8 (E.D. Va. Oct. 12, 2023) (granting Section 1782 application for discovery in proceeding in Mexico, noting that "[i]n the absence of 'reliable evidence' that the Mexican tribunal would not use any of the requested material, the second *Intel* factor counsels in favor of granting a § 1782 application" and highlighting "numerous cases demonstrating Mexican courts' general receptivity to U.S. courts' assistance in discovery...") (citing *In re Rivada Networks*, 230 F. Supp. 3d 467, 469 (E.D. Va. 2017); *Bush v. Cardtronics, Inc.*, No. H-20-2642, 2020 WL 6261694, at *4 (S.D. Tex. Oct. 23, 2020); and *Grupo Mexico Sab De CV*, No. 3:14-MC-00073-G-BH, 2014 WL 12691097, at *3 (N.D. Tex. Oct. 17, 2014)).

Here, the inquiry is more direct. Mexican legal authorities directly corresponded with at least two of the California Entities, Meta and X, demanding they remove the offending posts and identify the underlying user information. Ex. C, ¶¶15-27, 30. When presented with a cease-and-desist order, Meta's Mexican affiliate stated that any inquiries and requests to take down information needed to be made directly to the U.S. entity because their offices lacked the ability to provide the requested information (i.e., legal custody of the information) and the authority to take down the offending posts. *Id.* at ¶40. As to X, the order was unable to be delivered in Mexico. *Id*. Additionally, the Applicant already attempted to secure the information through the relevant legal authorities in Mexico in those authorities' demands that the California Entities remove the offending posts, to which the California Entities have

not responded. *Id.* at ¶41. In other words, this Application will assist law enforcement efforts already underway by authorities in Mexico. *Id.* at ¶32-34. Therefore, because the evidence shows that Mexico is receptive to U.S. federal court judicial assistance, and because there is nothing to show that the Mexican tribunal would object to discovery of the information sought by this Application, this factor weighs in favor of authorizing discovery.

### 3. Discovery Sought Through this Application Is Not an Attempt to Circumvent the Foreign Tribunal's Proof-Gathering Restrictions.

The third *Intel* factor is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542 U.S. at 264–65. Courts have found that this factor weighs in favor of discovery where there is "nothing to suggest that [the applicant] is attempting to circumvent foreign proof gathering restrictions." *In re Google Inc.*, No. 14-mc-80333-DMR, 2014 WL 7146994, at *3 (N.D. Cal. Dec. 15, 2014); see also *In re Eurasian Natural Resources Corp.*, No. 18-mc-80041-LB, 2018 WL 1557167, at *3 (N.D. Cal. Mar. 30, 2018) (third *Intel* factor weighs in favor of discovery where there is "no evidence" of an attempt to circumvent foreign proof gathering restrictions or policies).

Here, the Applicant is not attempting to circumvent any foreign proof-gathering restrictions or other policies of Mexico or the United States. Ex. C, ¶35. Authorities in Mexico are seeking the same information to investigate Applicant's criminal case, as evidenced by their correspondence to Meta and X, in addition to their demands that the posts at issue be removed. See *id.* at ¶¶15-29, 32-34, 36-39. This information will enable the Applicant, who is the Complainant in the criminal matter, to obtain this information to better assert that criminal complaint against the Anonymous Individuals. *Id.* at ¶37. Because there is nothing to suggest that the Applicant is attempting to circumvent foreign proof gather restrictions or policies, this factor weighs in favor of authorizing discovery.

4.    <u>The Requested Discovery Is Not Unduly Intrusive or Burdensome.</u>

The fourth and final *Intel* factor is whether "the discovery requested is unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. Requests are unduly intrusive and burdensome where they are not narrowly tailored and appear to be a broad "fishing expedition" for irrelevant information. *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).

The discovery sought by the Applicant is not unduly intrusive or burdensome. It is narrowly tailored only to seek information sufficient to satisfy two goals. First, this information will help the Applicant identify the Anonymous Individuals, such as their names, addresses, telephone numbers, and email addresses, or information that will lead to the discovery of that information. *See generally*, Ex. D; *also* see *In re Frontier Co., Ltd.*, No. 19-mc-80184-LB, 2019 WL 3345348, at *5 (N.D. Cal. July 25, 2019) (granting a Section 1782 request to issue a subpoena for identifying information, finding that the request "is narrowly tailored and is not overly intrusive [as] Frontier is seeking to subpoena identifying information and not the content of any communication…"); *In re Gianasso*, C 12-80029 MISC SI, 2012 WL 651647, at *2 (N.D. Cal. Feb. 28, 2012) ("the request is not unduly intrusive or burdensome because it seeks to gather only identifying information for [an anonymous poster] [], such as the name and address of the user, and not the content of any communication..."); *Ex Parte Darmon*, 17-MC-80089-DMR, 2017 WL 3283969, at *2 (N.D. Cal. Aug. 2, 2017) (finding that the proposed subpoena requesting documents that establish or would help to establish the identity of an anonymous author of blog posts including the username(s), given name(s), surname(s), email address(es), and affiliated IP addresses, was not unduly burdensome). Here, the Applicant has the content of the communications at issue—the Anonymous Individuals posted them on public platforms—it just needs information identifying those individuals.

/ / /

Second, this information will enable the Applicant and authorities in Mexico verify that the Anonymous Individuals are actually responsible for distributing various false and economically harmful statements across the internet. Confirmation of this information, namely IP addresses and other information like time signatures relating to the posts at issue, will enable authorities in Mexico to properly and accurately assess any arguments by the Defendants in the criminal action that they did not circulate these posts. This includes both the Anonymous Individuals and also the accounts where Applicant was able to ascertain limited information surrounding the identities of individuals associated with those accounts.

In the alternative, the Applicant invites any of the California Entities to meet and confer if those entities assert the requests are unduly burdensome but would like to discuss whether it is possible to narrow the information sought. See, e.g. *In re W. Face Cap. Inc.*, No. 19-MC-80090-LB, 2019 WL 1594994, at *3 (N.D. Cal. Apr. 15, 2019) ("West Face further states that it is willing to meet and confer with Google if Google believes that any of its requests are unduly burdensome. This factor weighs in favor of granting the application.")

Therefore, because the discovery requested here is limited and will only seek identifying information of the Anonymous Individuals and other limited data like date and time signatures for the posts at issue, and not any specific communications, the request is not unduly intrusive or burdensome.

## C.     The Applicant Seeks Early Discovery in Good Faith.

The Applicant's request for the Court's assistance to seek the information requested herein from the California Entities is the only way that the Applicant will be able to learn the identities of the Anonymous Individuals and gather evidence that they circulated the posts that harmed the Applicant and its affiliates.

/ / /

/ / /

/ / /

### 1. The Defendants Are Real People that Could Be Sued in Federal Court.

The accounts posting statements that harmed the Applicant show consistent viewpoints and dialogue and appear to be from the same individual or individuals. As stated above, the first good faith factor is whether "'the plaintiff can identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court.'" *In re Hoteles City Express*, No. 18-MC-80112-JSC, 2018 WL 3417551, at *3, (citing *OpenMind Solutions, Inc. v. Does 1–39*, No. 11–3311, 2011 WL 4715200, at *2 (N.D. Cal. Oct. 7, 2011) (citing *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578–80 (N.D. Cal. 1999)). In *OpenMind Solutions*, the plaintiff satisfied this factor by identifying the unique IP addresses concealing the defendants' real names to seek discovery from the services to which those addresses subscribed because those services would possess the underlying subscriber information and geographic location for the addresses at issue. *OpenMind Solutions*, No. 11–3311, 2011 WL 4715200, at *1–2.

Here, the Application, its supporting declarations (Exs. A, B, C), and the subpoenas enclosed as Exhibit D, list the specific accounts that posted the defamatory statements. Moreover, case law demonstrates the common knowledge that providers like the California Entities are indeed able to identify individual subscribers to their respective services and other data like user location, IP address, and metadata relating to user activity. See, e.g. *OpenMind Solutions*, No. 11–3311, 2011 WL 4715200, at *1–2. (identifying internet service providers ("ISPs")); *In re Med. Inc. Ass'n Keizankai*, No. 22-MC-80253-BLF, 2022 WL 5122958, at *4 (identifying Google users).

### 2. There Are No Other Steps Available to Locate this Information.

Because accounts like La Catrina Norteña are anonymous, the California Entities are the only place where those accounts' identifying and geographic information is available. Ex. B, ¶29. The Ninth Circuit good faith factors examine

whether a party seeking early discovery identified all other previous efforts and steps to locate the other parties' identities. *OpenMind Solutions*, No. 11–3311, 2011 WL 4715200, at \*3. Because the California Entities are located in California, no other method is available to obtain this identifying information, or any other information described in the subpoenas as to which users sent the offending posts. *Id.* at ¶30. Consequently, for these reasons and because this Court has jurisdiction over the California Entities, this Application is the next and only option the Applicant has to find the Anonymous Individuals' information and proof that they sent the posts at issue.

Accounts for handles like @nortenacatrina, @catrina_nortena, or El Charro Político, for example, include almost no identifying information. *Id.* at ¶31. Other accounts include limited information like certain first names or "geotags," which broadly indicate a town or neighborhood from which the account is posting. *Id.* at ¶32. Furthermore, where the accounts at issue do include names, it is unclear if these indicate actual posters' identities or are otherwise pseudonyms. *Id.* at ¶33. The Applicant already attempted to secure this information through the relevant legal authorities in Mexico via those authorities' demands that the California Entities remove the offending posts, to which the California Entities' have failed to respond. Ex. C, ¶¶40-42; *see also*, *e.g.*, *seescandy.com*, 185 F.R.D. at 579 (describing other correspondence and calls to locate the identity of the elusive defendants prepared simultaneously with the plaintiff's motion for a temporary restraining order for trademark infringement).

Again, when presented with a cease-and-desist order, Meta's Mexican affiliate stated that any inquiries and requests to take down information needed to be made directly to the U.S. entity because their offices lacked the ability to provide the requested information and the authority to take down the offending posts. *Id.* at ¶40. As to X, the order was unable to be delivered in Mexico. *Id*. Accordingly, this Application is the logical next step to obtain this information from the California

Entities. The Applicant adequately demonstrates that it made other good faith efforts to identify the Anonymous Individuals and evidence they circulated the posts at issue, and this Application is the logical and only next step to locate that information. *Id.* at ¶42. There is no other place the Applicant can seek those data to support its case in Mexico. This factor accordingly weighs in favor of granting this Application.

        3.      The Applicant's Suit Against the Defendants, Including the Anonymous Individuals, Could Withstand a Motion to Dismiss Under Mexican Law.

The facts alleged herein would be sufficient to withstand a Motion to Dismiss in this Court and under Mexican law. In short, a criminal action is already underway in Mexico, where law enforcement authorities are trying to seek the same information to assess possible criminal penalties against the persons responsible. Ex. C, ¶36. Because the Applicant's underlying action in Mexico is not a civil lawsuit, and authorities commenced a separate investigation, those circumstances satisfy or otherwise obviate this factor.

        4.      There Is a Reasonable Likelihood that Applicant Will Be Able to Identify and Serve the Anonymous Individuals Through this Discovery.

Sufficient legal authority exists where courts in this district previously granted parties' Section 1782 applications for similar reasons based on the simple circumstance that internet platforms require users to provide email addresses and other identifying information to create accounts. See, e.g. *In re Med. Inc. A'ss'n Keizankai*, 22-MC-80253-BLF, 2022 WL 5122958, at *1, 4 (granting a similar application to learn information associated with the account at issue like "names, addresses, email addresses, telephone numbers…and identifying access log information, such as IP addresses…"); *In re Frontier Co., Ltd.*, No. 19-mc-80184-LB, 2019 WL 3345348, at *1, 5 (granting Section 1782 application to subpoena network services provider for IP addresses, account information, and telephone,

address, and credit card information of account holders); *In re Gianasso*, C 12-80029 MISC SI, 2012 WL 651647, at *2 (seeking account information of a user that posted on Glassdoor.com); *Ex Parte Darmon*, 17-MC-80089-DMR, 2017 WL 3283969, at *2 (granting application to subpoena identifying account information for Wordpress.com users). Likewise, here the California Entities will be able to produce the same information that will lead to the Anonymous Individuals' identities and records that they sent the posts at issue. Accordingly, the Court should grant this Application.

## V. CONCLUSION

For the reasons stated above, the Applicant satisfies the statutory requirements of Section 1782 and the discretionary *Intel* and 9th Circuit factors. In light of the twin aims of Section 1782 to provide efficient assistance to foreign litigants and to encourage foreign countries by example to provide similar assistance to U.S. courts, this Court should exercise its discretion to authorize discovery against X, Meta, and Google so that the Applicant can conduct limited discovery to identify the Anonymous Individuals and gather other evidence for use in the criminal proceeding in Mexico.

Dated: April 12, 2024

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  */s/ Michael J. Hurvitz*

Michael J. Hurvitz
P. John Veysey

Attorneys for Applicant
BANCO AZTECA S.A. INSTITUCIÓN DE BANCA MÚLTIPLE